# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0832-18T3

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LAURA GONZALEZ,

     Defendant-Appellant.

_____

> Submitted September 29, 2020 – Decided November 5, 2020
>
> Before Judges Messano, Hoffman, and Suter.
>
> On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Indictment No. 18-02-0103.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Richard Sparaco, Designated Counsel, on the brief).
>
> Michael H. Robertson, Somerset County Prosecutor, attorney for respondent (Paul H. Heinzel, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Laura Gonzalez of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2), and the lesser-included disorderly persons offense of simple assault, N.J.S.A. 2C:12-1(a)(1). The judge sentenced defendant to nine years' imprisonment on the endangering count, and a concurrent 180-day term on the assault count.

Defendant raises the following points for our consideration:

POINT I

DEFENDANT'S STATEMENT AND HANDWRITTEN NOTE SHOULD HAVE BEEN SUPPRESSED.

POINT II

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL BECAUSE OPINION EVIDENCE ON THE ULTIMATE ISSUE OF PROOF OF CHILD ABUSE INVADED THE PROVINCE OF THE JURY.

POINT III

THE TRIAL COURT COMMITTED PLAIN ERROR BY PERMITTING THE JURY TO HAVE UNSUPERVISED ACCESS TO THE TRANSCRIPT OF DEFENDANT'S STATEMENT DURING ITS DELIBERATIONS. (Not Raised Below)

POINT IV

DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL DUE TO THE COURT'S UNWARRANTED JURY INSTRUCTION ON

2

"FALSE IN ONE – FALSE IN ALL." (Not Raised
Below)

POINT V

THE SENTENCE OF NINE YEARS NEW JERSEY
STATE PRISON WAS EXCESSIVE WHERE THE
COURT IMPROPERLY FOUND AGGRAVATING
SENTENCING FACTOR NUMBER TWO.

We have considered these arguments in light of the record and applicable legal
standards and affirm.

I.

Using some of the testimony later introduced at trial to provide context,
we consider the argument defendant raises in Point I.

Lisa and Seth B. hired defendant in January 2017, as an in-home nanny to
assist with the childcare of their infant son, at that point not yet two- years old.
At the time, Lisa was pregnant with the couple's second child, Tommy, who was
born in February 2017.[1]  After Lisa returned to work in May 2017, defendant
was home alone with the two children while the two parents were out of the
home at work.

---

[1]  Pursuant to Rule 1:38-3(d)(11) and N.J.S.A. 2A:82-46, we have used initials
and a pseudonym for the child victim in this case.  To avoid confusion and
provide specificity, we sometimes use first names of the child's parents.  We
intend no disrespect by this informality.

A-0832-18T3

The couple first noticed changes in Tommy's behavior in October 2017, when he began favoring his right leg. In November, while Lisa was away for business, Seth told her that Tommy had been crying more than usual and did not seem himself. Defendant also expressed her concern. Upon Lisa's return, appointments were made with the child's pediatrician and an orthopedist, both of which failed to resolve the issue. On Thanksgiving morning, the family prepared to travel to Long Island for dinner with relatives, but Tommy was still crying whenever Lisa tried to pick him up or touch his leg. The B.s decided to take Tommy to an urgent medical care office on Long Island, where he was seen by Dr. Aliah Kahn, a pediatrician. An x-ray revealed Tommy's right femur was fractured, which the doctor treated with a soft splint.

After the B.s left and returned to their family's home for dinner, Dr. Kahn called and advised them that Tommy's left foot was also fractured.[2] The doctor called New York's Department of Child Protection Services and urged the B.s to take the child to a hospital immediately, where the authorities could evaluate the situation. The B.s took Tommy to Morristown Memorial Hospital, where further diagnostic tests revealed a third, healing fracture, on the child's right leg. A caseworker from the Department of Child Protection and Permanency (DCPP)

---

[2] It was later revealed to be a fracture of the left tibia.

A-0832-18T3

and Detective Iris Reyes from the Somerset County Prosecutor's Office interviewed the couple about the child's injuries. Detective Reyes interviewed defendant at the prosecutor's office on the Monday that followed.

Judge Angela Borkowski conducted a pre-trial hearing on the admissibility of defendant's videotaped statement to Detective Reyes, and a note to Lisa that defendant wrote at the detective's invitation. Detective Reyes, who speaks Spanish fluently, conducted the interrogation in English and Spanish, and later translated the statement to produce a written transcript in English. Defendant wrote the note in her own hand in English.

After waiving her Miranda[3] rights, defendant began by generally denying responsibility for any of Tommy's injuries. Detective Reyes admittedly lied to defendant by telling her that video surveillance cameras in the home captured her interactions with Tommy when, in fact, there were no cameras. Under continued questioning, defendant acknowledged the possibility that she grabbed the child in a certain way and may have injured him, and that she sometimes had to stretch the child's legs to get him to sit in his chair. At one point, the following colloquy occurred:

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

A-0832-18T3

Detective Reyes: I don't know what could happen. And I am not going to lie to you[,] but yes[,] I can say that if you lie —

Defendant: Uh-humm.

Detective Reyes: The situation is going to get worse.

Defendant: But now what do I do about an attorney and everything?

Detective Reyes: That is your decision. I can't give you an opinion about anything.

Defendant: Yes, but —

Detective Reyes: The only thing I can say to you is, that telling the truth —

Defendant: Uh-humm.

Reyes: You will have a better option by telling the truth.

Defendant: Ok.

Reyes: Th[a]n lying.

Defendant: No, there is nothing else, [detective].

A short time later, when Detective Reyes accused defendant of supplying information "little piece by little piece," the following took place:

Defendant: Yes, it because you haven't (Inaudible)

Detective Reyes: No - - - What, what?

> Defendant: You're going to help me with an attorney.
>
> Detective Reyes: I'm going to help you with an attorney? Or no - - -
>
> Defendant: Yes, (Inaudible).
>
> Detective Reyes: Oh, no that is your decision, what you want to do.
>
>    . . . .
>
> Defendant: I don't know. I need you to guide me, I am honest, I don't know.
>
> Detective Reyes: I can't guide you, all that is [sic] want is to know what happened to the boy. And I can see that you are not helping.

Under continued questioning, however, defendant admitted being frustrated by the children and being stressed and "full of anger" toward the B.s. Defendant then admitted that she "t[ook] it all out on the boy, yes[,]" and also admitted that she struck the child with a closed fist in the head.

Near the end of the statement, the detective asked if defendant wished to write the B. family a note, and defendant agreed to ask the family for "[f]orgiveness of course, for everything that I did, the stupid things that I did." The note read:

> Lisa, I'm so sorry about what happened. I never been happy in your home. I stayed because I have family to feed and to – me, too. I never thought to been [sic] in

A-0832-18T3

the monster [–] that I transformed.  My life will never be the same and yours, either.  I hope God forgive me and all that I did.  It's no apology that can change that[,] but I hope that you can understanding [sic] I never feel like family.

In her oral opinion that followed the hearing, Judge Borkowski comprehensively examined the testimony regarding the administration of Miranda rights to defendant and extensively cited relevant case law.  She found that defendant "knowingly, intelligently and voluntarily waived all of her rights."  The judge also concluded that "defendant did not equivocally or unequivocally invoke her right to an attorney post[-]Miranda."  The judge found that "defendant was aware that she had the right to an attorney[,] but her reference to an attorney was not a request for one when Detective Reyes indicated she could not guide [defendant.]"  Judge Borkowski entered an order denying defendant's motion to suppress her statement to Detective Reyes and the note she wrote to the B.s.

Defendant reprises her argument before us, contending that the exchanges with Detective Reyes quoted above demonstrate she invoked her right to counsel, which in turn required the detective to cease any interrogation.  We disagree substantially for the reasons expressed by Judge Borkowski in her thorough oral opinion.  We add only the following.

A-0832-18T3

"In the context of custodial interrogation, once a defendant clearly and unambiguously invokes his right to remain silent, interrogation must cease." State v. Maltese, 222 N.J. 525, 545 (2015) (citing State v. Diaz-Bridges, 208 N.J. 544, 564 (2011)). "When a suspect's words are ambiguous, th[e] Court has permitted police to follow up by asking questions that are designed to clarify the meaning of those words." State v. Alston, 204 N.J. 614, 623 (2011) (citations omitted). "Appellate courts considering whether a suspect has invoked or even ambiguously invoked the right to remain silent must consider the totality of the circumstances, including all of the suspect's words and conduct." Diaz-Bridges, 208 N.J. at 569.

Judge Borkowski considered our opinion in State v. Messino, 378 N.J. Super. 559 (App. Div. 2005), finding it particularly apt, as do we. There, after waiving his rights and agreeing to provide a statement, the defendant asked police, "Do you think I need a lawyer?" Id. at 573. The officer replied that while it was his responsibility to tell the defendant he had the right to an attorney, "that [decision] was his call." Ibid. Shortly thereafter, the defendant admitted his guilt. Ibid.

On appeal, the defendant contended his question was "an ambiguous request for a lawyer[,]" and that all further interrogation should have stopped.

9

Id. at 577.  We rejected the argument, noting the defendant was aware of his right to counsel and could have requested an attorney, but his question to police "was not such a request."  Id. at 578; see also Alston, 204 N.J. at 618, (holding the defendant's questions — "Should I not have a lawyer in here with me?" and "[i]f I did want a lawyer . . . with me how would I be able to get one[?]" — were not invocations of the right to counsel, ambiguous or otherwise).

## II.

Defendant next argues that portions of the B.s' testimony at trial, combined with the testimony of the State's expert witness, Dr. Gladibel Medina, a board-certified pediatrician with a "sub-specialty in the field of . . . child abuse[,]" was improper opinion evidence on the ultimate issue, i.e., defendant's abuse of Tommy.  We discuss the specific testimony defendant cites as requiring reversal.

During her direct examination, Lisa said the child protection authorities in New York were notified because Tommy's right femoral fracture was "clear child abuse."  The prosecutor asked if Dr. Khan explained how the fracture occurred, at which point defense counsel objected on hearsay grounds.  The prosecutor argued the evidence was admissible under N.J.R.E. 803(c)(4).  The judge overruled the objection, and Lisa responded, "[t]hey said the way that it

A-0832-18T3

was done was intentional. There is no way that there is an accident. [Ninety-nine] percent of the cases of this was intentional abuse." After Lisa's cross-examination, Judge Borkowski told the jury:

> [Y]ou heard from this witness . . . regarding certain statements that [Dr.] Khan gave to her.
>
> [T]hose statements were admitted not for the truth of the matter asserted but to explain the actions that this witness took subsequent to hearing those statements from [Dr.] Khan, as for any steps she may have taken included, but not limited to, as for treatment of [Tommy].
>
> So they were not admitted for the truth of the matter asserted or the statements asserted.

During his direct examination, Seth offered a nonresponsive answer to a question from the prosecutor that Dr. Khan said Tommy's injury was a "textbook [case of] child abuse." In response to defense counsel's objection at side bar, Judge Borkowski told the jury that Seth's answer was stricken, and it was "purely hearsay[,]" and "an opinion that [Seth was] not qualified to give[.]"

Dr. Medina, who had reviewed Tommy's medical reports, as well as statements the B.s and defendant made to DCPP's caseworkers, described the mechanism of the injuries and opined they were not accidental. Dr. Medina admitted that she never reviewed defendant's statement to Detective Reyes, but

she concluded that the injuries were consisted with defendant's admitted actions as described in the investigative reports.

We apply a deferential standard of review to the trial court's evidentiary ruling. State v. Scott, 229 N.J. 469, 479 (2017). Additionally, "[t]rials are not perfectly orchestrated productions." State v. Yough, 208 N.J. 385, 388 (2011). "Whether testimony or a comment by counsel is prejudicial and whether a prejudicial remark can be neutralized through a curative instruction or undermines the fairness of a trial are matters 'peculiarly within the competence of the trial judge.'" Id. at 397 (quoting State v. Winter, 96 N.J. 640, 646–47 (1984)).

As to Lisa's testimony, the State continues to assert it was admissible pursuant to N.J.R.E. 803(c)(4), which provides that a good faith statement "pertinent to, medical diagnosis or treatment[,] and describes medical history; past or present symptoms or sensations; their inception; or their general cause[,]" is excepted from the hearsay rule. Obviously, the rule permits the admissions of statements made by the declarant, i.e., the patient, to a medical provider for the purposes of diagnosis and treatment. Here, Lisa was simply repeating the opinion of the doctor, and the evidence was not admissible under N.J.R.E. 803(c)(4) to prove the truth of the matter asserted.

A-0832-18T3

However, Judge Borkowski gave a strong curative instruction that limited the jury's use of the information and, more importantly, clearly told the jurors they could not accept as a fact that Tommy was the victim of child abuse. Lastly, Dr. Khan testified before the jury and, after describing her findings, said she "advised the parents th[e] . . . fracture [was] pathognomonic for non-accidental trauma."

Seth's testimony was stricken immediately. Defendant argues the judge's curative instruction went too far, and that defense counsel only requested that the jury be told the statement was stricken. This argument lacks sufficient merit to warrant discussion. R. 2:11-3(e)(2). The judge did not mistakenly exercise her discretion.

Lastly, there was nothing objectionable about Dr. Medina's testimony, and, indeed, we note that no objection was made by defense counsel at trial. Defendant fully probed the data that formed the bases for the doctor's opinions, including her failure to review certain critical information, like the transcript of defendant's statement to Detective Reyes. See N.J.R.E. 703. Contrary to defendant's argument before us, N.J.R.E. 704 specifically permits the expert to give an opinion that "embraces an ultimate issue to be decided by the trier of fact[,]" although an expert may not link that opinion to the guilt of the defendant,

thereby usurping the sole function of the jury. State v. Reeds, 197 N.J. 280, 292 (2009). Here, the doctor opined that the mechanics and nature of injuries Tommy suffered were consistent with the actions defendant was alleged to have committed as reflected in various investigative reports.

We conclude that to the extent inadmissible evidence was heard by the jury, in light of the judge's actions, none of the testimony raises a reasonable doubt that its admission led the jury to a result it otherwise would not have reached. Scott, 229 N.J. at 483–84 (citing R. 2:10-2).

III.

The issues raised in Points III and IV were never the subject of objections at trial and so we review the arguments under the plain error standard. "Plain error is that which is 'clearly capable of producing an unjust result.'" State v. Singleton, 211 N.J. 157, 182 (2012) (quoting R. 2:10-2).

Defendant argues that Judge Borkowski erred by permitting the jury to have unfettered access to the transcript of defendant's statement during deliberations. Defendant likens the transcript to video recordings of a defendant's pretrial statement, which, she correctly notes, should not be supplied to the jury during deliberations except under the supervision of the trial judge. State v. Weston, 222 N.J. 277, 289 (2015). That is so because "[t]he video

recording is the functional equivalent of a live witness and can be particularly persuasive." Ibid. (quoting State v. A.R., 213 N.J. 542, 560 (2013)). However, in State v. DeBellis, we held that allowing transcripts of tape recordings of conversations admitted into evidence into the jury room during deliberations was not reversible error, particularly where the judge gave a limiting instruction as to the proper use of the transcript only as an aid for understanding the recordings. 174 N.J. Super. 195, 199 (App. Div. 1980).

Here, after the judge recognized the need to provide a limiting instruction regarding the transcript, defense counsel lodged no objection to it being provided to the jury during deliberations. The prosecutor submitted a proposed charge consistent with our holding in DeBellis. When Judge Borkowski asked defense counsel to state his position, he replied, "I agree with that[,]" at which point the judge noted she would instruct the jury regarding the use of the transcript "pursuant to the proposal and the consent of [defense counsel]." The judge gave the jury these limiting instructions before distribution of the transcript and playback of defendant's videotaped statement at trial; she also told jurors the transcript would be provided to them during their deliberations. During her final jury charge, Judge Borkowski repeated more than once that the transcript was "an aid" or "guide to understanding the recording[.]"

Initially, any claim of error in this regard is subject to the invited error doctrine. See A.R., 213 N.J. at 561 ("[T]rial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal.'" (quoting State v. Corsaro, 107 N.J. 339, 345 (1987))). Further, given the limiting instructions repeatedly provided by Judge Borkowski, we find no reversible error under these circumstances.

In Point IV, defendant contends it was plain error for Judge Borkowski to provide the "false in one, false in all" charge to the jury. See Model Jury Charge (Criminal), "False in One False in All" (1991). The Model Charge tells jurors that if they find any witness "willfully or knowingly testified falsely to any material facts in the case, with intent to deceive [them], [the jury] may give such weight to his or her testimony as [they] may deem it is entitled." Ibid. Whether to provide the charge rests with sound discretion of the trial judge. State v. Young, 448 N.J. Super. 206, 228 (App. Div. 2017) (citing State v. Ernst, 32 N.J. 567, 583–84 (1960)). Here, it was not error to give the charge, particularly since defense counsel's closing argument challenged the parents' credibility and highlighted alleged inconsistencies in their testimony.

A-0832-18T3

IV.

Defendant argues her sentence was excessive, specifically because the judge engaged in impermissible "double counting" by finding aggravating factor two applied. See N.J.S.A. 2C:44-1(a)(2) ("The gravity and seriousness of harm inflicted on the victim, including . . . that the victim . . . was particularly vulnerable or incapable of resistance due to . . . extreme youth, or was for any other reason substantially incapable of exercising normal physical or mental power of resistance[.]"). We disagree.

"Appellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). As the Court has said:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364–65 (1984)).]

"[A] sentencing court must scrupulously avoid 'double-counting' facts that establish the elements of the relevant offense." Id. at 74–75 (citing State v. Yarbough, 100 N.J. 627, 645 (1985)). Defendant claims the judge erred in

17

finding aggravating factor two because Tommy's age was an element of the crime of endangering, and, thus, the judge engaged in double counting.

In addition to aggravating factor two, Judge Borkowski also found aggravating factors three and nine. See N.J.S.A. 2C:44-1(a)(3) (the risk of re-offense); (a)(9) (the need to deter defendant and others). The judge found mitigating factor seven applied. See N.J.S.A. 2C:44-1(b)(7) (defendant's lack of a prior criminal record). Specifically, as to factor two, the judge noted that N.J.S.A. 2C:24-4 criminalizes conduct directed to someone under the age of eighteen, and that Tommy "was substantially under the age requirement and of extreme youth." She noted he was "incapable of any resistance[,]" since he was only nine-months old and particularly vulnerable, because he was the target of defendant's "anger . . . against his parents."

In State v. Taylor, we rejected the defendant's argument that the court engaged in double counting when it found aggravating factor two. 226 N.J. Super. 441, 453 (App. Div. 1988). In that case, the defendant was convicted of sexual assault pursuant to N.J.S.A. 2C:14-2(b), an element of which is that the victim be less than thirteen years of age. Ibid. In Taylor, the victim was the defendant's four-year-old niece. Ibid. We held that "[t]he extreme youth of the victim was a proper aggravating factor to have been considered by the court"

A-0832-18T3

because while age was an element included within the crime, the seriousness of harm inflicted on someone four-years old must still be considered.  Ibid.

We find the facts of this case analogous, and conclude there was no mistaken exercise of the judge's wide discretion in fashioning an appropriate sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0832-18T3